UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTICT OF MICHIGAN
SOUTHERN DIVISION

MELANIE PARDEE,

                Plaintiff,

        v.

MICHAEL ASTRUE,
Commissioner of Social Security,

                Defendant.

_____/

Case No.: 11-CV-10334

Honorable Avern Cohn
Magistrate Judge David R. Grand

## REPORT AND RECOMMENDATION
## ON CROSS-MOTIONS FOR SUMMARY JUDGMENT (Docs. #9, 10)

Plaintiff Melanie Pardee brings this action pursuant to 42 U.S.C. § 405(g), challenging a final decision of Defendant Commissioner of Social Security ("Commissioner") denying her application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under the Social Security Act (the "Act"). Both parties have filed summary judgment motions (Docs. #9 and 10) which have been referred to this court for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).

## I.      RECOMMENDATION

For the reasons set forth below, the court finds that substantial evidence supports the Administrative Law Judge's ("ALJ") assessment that, despite her limitations, Pardee retains sufficient residual functional capacity ("RFC") to perform a significant number of jobs in the national economy and is therefore not disabled under the Act. Accordingly, the court recommends that the Commissioner's Motion for Summary Judgment (Doc. #10) be granted, Pardee's Motion for Summary Judgment (Doc. #9) be denied, and that, pursuant to sentence four

of 42 U.S.C. § 405(g), the Commissioner's decision be affirmed.

## II.    REPORT

### A.    Procedural History

On November 8, 2002, Pardee filed an application for DIB and SSI, alleging disability as of June 16, 2002.  (Tr. 54-55).  The claim was initially denied and Pardee timely requested an administrative hearing.  (Tr. 54).  Pardee, represented by attorney Richard Doud, testified at the hearing, which was held on October 21, 2004 before ALJ Thomas English.  (Tr. 54).  Vocational expert ("VE"), Sandra Steele, also testified.  (*Id.*).  On December 20, 2004, ALJ English issued a written decision determining that Pardee was not disabled, finding that although she could not perform her past relevant work, she was able to perform significant other work in the national economy.  (Tr. 60).  The Appeals Counsel denied review of Pardee's case on April 19, 2005.  (Tr. 65).  Pardee did not seek judicial review of that decision.

On August 17, 2006, Pardee filed a second application for DIB and SSI, alleging disability as of November 4, 2002.  (Tr. 110).  Her claim was initially denied on November 8, 2006.  (Tr. 70, 74).  Thereafter, Pardee filed a timely request for an administrative hearing, which was held on February 11, 2009 before ALJ Bryan Bernstein.  (Tr. 28).  Pardee, represented by attorney Mikel Lupisella, testified, as did VE Mary Williams.  (*Id.*).  On September 1, 2009, ALJ Bernstein found that Pardee was not disabled because, despite her limitations, she retained the capacity to perform a significant number of jobs available in the national economy.  (Tr. 9-24).  On November 24, 2010, the Appeals Council denied review.  (Tr. 1).  Plaintiff filed for judicial review of the final decision on January 27, 2011.  (Doc. #1).

### B.    Background

Pardee lists, in her most recent application, a disability onset date of November 4, 2002.

2

However, since an application for a time period including that date was decided on its merits by an ALJ on December 20, 2004, and Pardee did not seek judicial review of that decision within the appropriate time limits, that decision is final and unreviewable by this court.  42 U.S.C. § 405(g); *see also White v. Comm'r of Soc. Sec.* 37 Fed. Appx. 197, 198 (6th Cir. 2002) (complaint filed two years after ALJ decision untimely and not subject to review by the court).  Thus, the court's review of Pardee's claims is limited to the time period commencing after December 20, 2004.

### 1.   *Disability Reports*

In disability reports filed in August and September 2006, Pardee stated that the following conditions limited her ability to work: carpal tunnel and tendonitis in both arms, and tendonitis and arthritis in the right shoulder.  (Tr. 151).  She stated that if she overused her arms she would drop things and lose strength in her right arm.  (*Id.*).  She also said she had a problem lifting more than twenty pounds.  (*Id.*).  According to her report, for the bulk of her career Pardee worked as a press operator, which required her to do repetitive tasks such as handling, grabbing or grasping big objects, clipping, trimming and reaching.  (Tr. 152; 168).  In addition, Pardee routinely lifted 25 pounds and occasionally lifted up to 50 pounds.  (*Id.*).  She was terminated from that position in November 2002, according to her report, "because I used up all my vacation pay and family medical leave act."  (Tr. 151).  Pardee reported numerous doctors who had treated her complaints of pain in her arms, and she had undergone several procedures and tests including an EMG, an MRI/CT scan and some physical therapy.  (Tr. 156).  At the time of her report, Pardee reported using only one medication, Prileptal, which she stated was for pain and muscle relaxation.  (*Id.*).

Pardee reported that she lived with her daughter and grandchildren in a house.  (Tr. 159).

Her typical day would include taking her boyfriend to work around 6:45 a.m., going back to sleep, taking a bath, doing "simple household chores," helping with the children, running errands, sleeping, staying home until she needed to pick up her boyfriend from work around eight or nine p.m., and then retiring around 10:30 p.m. (*Id.*). She reported that she prepared meals on a daily basis, did the dishes, dusted, washed laundry, shopped and occasionally mowed the lawn. (Tr. 161-62). Pardee reported pain in her elbow, forearm and upper arm/shoulder, as well as pain beginning in her left elbow and occasional numbness in her fingers. (Tr. 160). She reported that this pain interfered with her daily activities as she would have some pain from having to reach when she performed tasks such as bathing, dressing, shaving or caring for her hair. (*Id.*). Pardee stated that she used gel padded gloves and a splint on a daily basis as well as when she would drive or write for a long period of time. (Tr. 165).

In a follow-up report filed in December 2006, Pardee stated that the pain in her hands, arms and elbows had worsened, that she was on three medications: Darvocet, Flexeril and Vicodin, and that any activity increased her pain. (Tr. 180-185). In a subsequent report filed in February 2009, Pardee stated that, in addition to the other pain she experienced, she had broken her left elbow in September, 2007,[1] had undergone three surgeries on it and continued to receive care for numbness in her left hand. (Tr. 188). She also stated that carpal tunnel had been discovered in her left elbow for which she had received EMGs, a CT scan, medication and therapy. (Tr. 187-88). At that time she reported the following medications: Tylenol, Vicodin and Celebrex, prescribed in September 2007 for pain and arthritis, and Vicodin prescribed again in 2008 for pain. (Tr. 189). The second Vicodin prescription and the Celebrex had been issued by Dr. Coffey, according to Pardee's report. (*Id.*). She also reported having attempted to return

---

[1] Medical records in the file show that it was actually September, 2006 when Pardee fell and broke her elbow. (Tr. 247).

to work as a press operator in 2008 for another company, but according to her report, she "failed" and was "fired."  (Tr. 190).

### 2.   The February 11, 2009 Administrative Hearing

#### a.   Plaintiff's Testimony

Pardee testified that she was a high school graduate who had taken some college classes. (Tr. 37).  She had lost her job in 2002 after suffering a repetitive use injury to her right arm as a press operator and she claimed that the condition had gotten worse since that time.  (Tr. 35-36). She had attempted to return to work as a press operator at a different company in 2008, but she was quickly fired after she failed to keep up with the work.  (Tr. 37-38; 43).  Pardee testified that she was currently taking Vicodin, prescribed by Dr. Coffey, as well as Celebrex for arthritis. (Tr. 38-39; 44).  She testified that Dr. Coffey had not attempted to wean her off the Vicodin.  (Tr. 44).  She testified that she lived in a house with her boyfriend, (Tr. 39), and she was able to do some household chores such as vacuuming for about five minutes at a time, light cooking, and driving short distances, but that she needed assistance with shopping.  (Tr. 39-40).  Pardee testified that the medications she was on made her sleepy, but that she was not able to sleep through the night due to pain and discomfort.  (Tr. 41-42).  Instead she would nap approximately twice a day.  (Tr. 42).  She testified that the most she was able to lift is a gallon of milk, and that she would do so with two hands for support.  (*Id.*).  Pardee testified that she had problems with her grip strength, and that she would struggle with things like buttons and clasps.  (Tr. 43).  She also testified to problems when she tried to reach overhead or push or pull things.  (*Id.*).  When asked why she did not try some less physical work, Pardee responded that her pain level was extremely high and with the pain medication she would get very dizzy and drowsy and tired. (Tr. 44).

b.       *Vocational Expert's Testimony*

Next, VE Mary Williams testified.  (Tr. 45).  The ALJ asked her to consider whether a person who could not reach extreme postures, including reaching while stooping, kneeling or bending more often than occasionally, who could not engage in work involving frequent or fine manipulation with the hands, could not lift or carry more than ten pounds occasionally and three pounds frequently, could engage in the type of past work in which Pardee had engaged.  (*Id.*).  Williams testified that such a person would not be able to engage in Pardee's past relevant work, but that there were other sedentary unskilled or light unskilled jobs in which such a person could engage.  (Tr. 45-46).  These included surveillance system monitors, information clerks and security guards.  (Tr. 46-47).  VE Williams testified that in the lower peninsula of Michigan there were approximately 650 surveillance monitor jobs, 1,400 sedentary information clerk jobs, 1,200 light information clerk jobs and 4,600 security guard jobs.  (*Id.*).  When asked by counsel about the number of excused absences these jobs permitted, VE Williams testified, "one absence per month."  (Tr. 47).  She further testified that this was in addition to whatever sick and vacation time a person accrued in such a position.  (Tr. 47-48).  Similarly, when asked by counsel about the ability to nap on the job, VE Williams testified that it would be preclusive, but when asked by the ALJ if people could nap on their breaks, she testified they could.  (Tr. 48-49).

3.       *Medical Evidence*

a.       *Treating Sources*

Records from one of Pardee's treating physicians, Dr. Carol Vorenkamp, through September of 2005, show that she was being treated for the pain in her right arm and shoulder. During that time she underwent several tests as well as physical therapy.  On May 11, 2005, an MRI was performed on Pardee's right shoulder, which showed only mild degeneration in her

shoulder joint and "no other significant findings," and no need for surgical repair at that time. (Tr. 205-206; 211).  The reviewing orthopedist gave her an injection of cortisone in her shoulder for stiffness.  (*Id.*).  On June 20, 2005, Pardee underwent an EMG and nerve conductive study, which found "no evidence of nerve entrapment . . . neuropathy or cervical radiculopathy."  (Tr. 204).  She also participated in a course of physical therapy, which she told the orthopedist was improving her condition.  (Tr. 205; 207-210).  The physical therapist noted improvement also. (Tr. 207-208; 203).  However, Pardee failed to complete her course of therapy and on July 7, 2005, she was discharged for "failure to return for further treatment."  (Tr. 203).

In March 2006, Pardee was examined by Dr. Gavin Awerbuch who diagnosed ulnar neuropathy, right lateral epicondylitis and right shoulder impingement, tendonitis, laxity and possible rotator cuff tear.  (Tr. 239).  He noted that several previous physicians had diagnosed mild ulnar neuropathy at the wrists, and had limited Pardee to lifting no more than ten pounds and no repetitive use of her hands, particularly her right one.  (Tr. 238).  Dr. Awerbuch prescribed an EMG, Feldene and tramadol for the inflammation and pain, a tennis elbow strap and gel pads, and a course of physical therapy.  (Tr. 239).  The EMG found right ulnar sensory neuropathy.  (Tr. 240).

Pardee completed the prescribed physical therapy course, attending eight out of ten sessions.  (Tr. 239; 234; 216-233).  Her physical therapist noticed a "40% improvement" in Pardee's right elbow during the course of her rehabilitation.  (Tr. 216).  It was noted, however, that Pardee had been inconsistent in her follow-through and that this was the reason some of her long term therapy goals had not been met.  (Tr. 216).  For example, Pardee had complained of edema in her elbow to the therapist, but had admitted she had not been wearing the elbow strap consistently.  (Tr. 216).  The therapist noted that despite Pardee's inconsistency, some long term

7

goals had been met, namely her increase in grip strength by six pounds to forty, and a reduction in the pain she felt. (Tr. 216; 223; 227). In addition, by the end of therapy, Pardee reported no tingling in her hand. (Tr. 216). The therapist determined that Pardee's treatment should be discontinued and that she should return to her physician for follow-up. (Tr. 216). At a follow-up visit on May 2, 2006, Dr. Awerbuch continued to note right ulnar neuropathy at Pardee's wrist, right lateral epicondylitis, and right shoulder impingement and tendonitis. (Tr. 237). He gave her cortisone injections at her shoulder and elbow and prescribed Tileptal, Lodine and Lidoderm. (*Id.*). This is the last record in the file relating to any treatment of Pardee's right arm.

On September 16, 2006, Pardee went to the emergency room after a fall. X-rays revealed a "fracture/dislocation of the left elbow with evidence of a coronoid process fracture and radial neck fracture, as well as a posterior dislocation." (Tr. 242). Dr. Michael Spagnuolo and Dr. Rhonda Whelan performed a closed reduction on Pardee, which was unsuccessful. (Tr. 242-43; 247). A second closed reduction was performed by Dr. Spagnuolo and Dr. Michael Schmidt on September 22, 2006. (Tr. 254). However, the surgeons did not have the needed implants to replace Pardee's radial head, and so a third surgery, an open reduction and internal fixation, was performed on October 6, 2006 by Dr. Kelly Coffey. (Tr. 244; 253; 271).[2]

After surgery, Pardee followed up with Dr. Coffey on October 23, 2006. (Tr. 269). According to Dr. Coffey's report, Pardee had been doing very well and had "no complaints of pain or swelling," but did have "some stiffness and weakness in the left upper extremity," which Dr. Coffey attributed to her "wearing her sling too much." (*Id.*). X-rays taken at that time revealed "good hardware fixation and placement with good reduction of the radial head fracture

---

[2] At a follow-up appointment with Drs. Spagnuolo and Schmidt on September 26, 2006, Pardee complained that the Vicodin she was taking was making her nauseous. (Tr. 253). The doctors prescribed Darvocet instead. (*Id.*).

and radial neck fracture." (*Id.*).  Dr. Coffey prescribed a course of occupational and physical therapy. (*Id.*).  At a November 20, 2006 appointment, Dr. Coffey noted that Pardee had been progressing with her physical therapy but that there was still "weakness in extension of the left thumb." (Tr. 284).  Dr. Coffey suggested that she progress in her therapy to five to ten pounds of weight bearing and follow up in three weeks. (*Id.*).  On December 11, 2006, Dr. Coffey again examined Pardee, finding that she was "doing okay with physical therapy," though her "weight limit has been five pounds until healing." (Tr. 283).  Dr. Coffey noted that Pardee had "no numbness or tingling" but "still has some stiffness." (*Id.*).  Dr. Coffey proposed aggressive physical therapy with full weight bearing and aggressive work on range of motion, with a follow-up in four weeks. (*Id.*).  A follow-up on January 8, 2007, yielded a determination that while Pardee was "making some improvements," in that she had no numbness or tingling, continued physical therapy was needed to improve "the last 15-20 degrees of extension," as well as pronation and supination which were "not very good." (Tr. 305).

At a February 21, 2007 appointment, Dr. Coffey found Pardee "significantly improved" albeit with some tingling in her fourth and fifth fingers of her left hand. (Tr. 304).  He ordered an EMG, the results of which were reviewed at a March 12, 2007 appointment. (Tr. 301; 304).  It showed some abnormalities with left radial neuropathy, but was negative for recurrent ulnar neuropathy. (*Id.*).  In his treatment report, Dr. Coffey noted that Pardee had told him she had bilateral ulnar neuropathies "for years." (*Id.*).  Dr. Coffey did not believe the EMG's finding of radial neuropathy was consistent with Pardee's symptoms which were more akin to ulnar neuropathy. (*Id.*).  Upon examination, Dr. Coffey found that Pardee's injury had healed well and that she had "near full range of motion of the left elbow for flexion, extension, supination and pronation." (*Id.*).  Dr. Coffey prescribed Neurontin at that time for Pardee's symptoms. (*Id.*).

On March 15, 2007, Dr. Coffey wrote a letter "To Whom It May Concern" regarding Pardee's condition. (Tr. 302). Dr. Coffey noted Pardee's reports of bilateral arm neurological symptoms that had prevented her from working. (*Id.*). The letter stated that Pardee's left arm was improving significantly since her injury, and that an EMG suggested neuropathy, but that it was improving. (*Id.*). Dr. Coffey stated that Pardee had "passed all physical therapy milestones and her exams to date are pretty good as far as range of motion with near full flexion, extension, supination and pronation of the elbow." (*Id.*). Dr. Coffey opined that "[i]t may be difficult for [Pardee], due to this neuropathy, to perform repetitive factory-type work exercises. As far as her elbow goes, she has made significant improvements and while she may be able to do certain activities, it could be difficult for her to do repetitive activities and lifting." (*Id.*).

At a June 11, 2007 follow-up, Pardee still mentioned tingling in her fourth and fifth fingers of her left hand and Dr. Coffey recommended a neurological consult, but there is no evidence in the record that Pardee followed through on this. (Tr. 300). At a July 9, 2007 appointment, Pardee complained of the same symptoms and Dr. Coffey sent her back for a follow-up EMG to see if there was any change, and a possible ulnar nerve transposition. (Tr. 299). However, at a July 30, 2007 appointment, Pardee stated she was unable to get the EMG due to financial constraints. (Tr. 298). Dr. Coffey prescribed Motrin and a follow-up in four months. (*Id.*).

At the follow-up appointment on November 26, 2007, Pardee continued to complain of pain in her left palm and into her fourth and fifth fingers. (Tr. 297). She felt that she also had swelling around her elbow as well as some shooting pains. (*Id.*). Upon examination, Dr. Coffey did not notice any edema around the elbow and there was no tenderness to palpation. (*Id.*). He also found Pardee's left arm grip strength was equal to her right. (*Id.*). Dr. Coffey diagnosed

possible cervical radiculopathy and recommended a new EMG as well as a cervical spine MRI. (*Id.*).  The EMG was consistent with ulnar nerve neuropathy, possibly at the elbow.  (Tr. 296). The MRI was negative for any pathology.  (*Id.*).  Pardee elected to proceed with left elbow ulnar nerve transposition surgery, which was performed by Dr. Coffey on January 22, 2008.  (*Id.*; 295).

At a post-operative appointment, Dr. Coffey noted that Pardee still complained of some tingling in fingers four and five, but was "doing well."  (Tr. 291).  Upon examination, Dr. Coffey observed no tenderness to palpation, though there was a somewhat limited range of motion "due to postoperative immobilization."  (*Id.*).  Dr. Coffey prescribed physical therapy, but Pardee did not follow through.  (*Id.*).  On March 19, 2008, Pardee admitted that she had not made it to physical therapy yet, and that she still had some pain in her fourth and fifth fingers, but that "otherwise she is not painful."  (Tr. 306).  Dr. Coffey re-prescribed physical therapy, and also prescribed a TENS unit desensitization protocol "due to the fact that this is going to be a prolonged course and she had a chronic ulnar nerve entrapment," concluding that "it is going to take a lot of time to get better."  (*Id.*)  Dr. Coffey recommended a follow-up appointment in three months.  (*Id.*).  However, there are no subsequent records relating to this treatment.[3]

b.   *Consultative and Non-Examining Sources*

On October 21, 2006, Pardee was examined by Dr. Asit Ray.  (Tr. 260-267).  Her chief complaints were continuing numbness and tingling in the right hand at the ulnar nerve distribution, tingling and numbness in all fingers and the palm of the left hand, and pain in the right shoulder and in the lower portion of the left forearm.  (Tr. 261).  The examination took

---

[3] At the hearing, the ALJ noted that he only had medical records up until February 2008.  (Tr. 45).  Pardee's counsel stated on the record that he would submit more recent medical records to the ALJ.  However the ALJ, in his decision, noted that he only received one additional record, Dr. Coffey's March 19, 2008 treatment notes.  (Tr. 45; 20).

place only two weeks post-operation for Pardee's left elbow, so Dr. Ray only examined her right arm. (Tr. 261-63). He noted that she had normal range of motion in her shoulder, elbow and wrist. (Tr. 261). She was able to make a full fist in the right hand and had grip strength of 45 pounds. (Tr. 262). Dr. Ray determined there were no abnormal findings in her right upper extremity. (*Id.*).

On November 8, 2006, Dr. Wayne Sams reviewed Pardee's records for an RFC assessment. (Tr. 274-281). He determined that she was capable of occasionally lifting twenty pounds, frequently lifting ten pounds, standing and/or walking about six hours in an eight-hour day and sitting the same amount. (Tr. 275). Her ability to pull was limited in her upper extremities. (*Id.*). He also found that she could only occasionally climb ramps, stairs, ladders, etc., and that she could only occasionally crawl, due to problems with her wrists. (Tr. 276). Dr. Sams further found that she had unlimited ability to reach and feel, but had limited ability to handle or finger. (Tr. 277). He clarified that she could handle or finger "frequent[ly] but not continuously." (*Id.*). He determined that she should avoid concentrated exposure to vibration, but did not explain the rationale behind this conclusion. (Tr. 278). Dr. Sams concluded that Pardee's complaint that she had problems reaching and that she dropped things was not credible in that there was "no evidence of [a] compromised grip on [either the] right or left [hand]." (Tr. 279). Dr. Sams noted there was not a treating source statement in the file. (Tr. 280).

### C.       Framework for Disability Determinations

Under the Act, DIB and SSI are available only for those who have a "disability." *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). The Act defines "disability" in relevant part as the

> inability to engage in any substantial gainful activity by reason of any medically
> determinable physical or mental impairment which can be expected to result in

12

death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).

The Commissioner's regulations provide that a disability is to be determined through the application of a five-step sequential analysis:

Step One: If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.

Step Two: If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.

Step Three: If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education, or work experience.

Step Four: If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

Step Five: Even if claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

*Scheunieman v. Comm'r of Soc. Sec.*, No. 11-10593, 2011 U.S. Dist. LEXIS 150240 at *21 (E.D. Mich. Dec. 6, 2011) *citing* 20 C.F.R. §§ 404.1520, 416.920; *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "The burden of proof is on the claimant throughout the first four steps . . . . If the analysis reaches the fifth step without a finding that claimant is not disabled, the burden transfers to the [defendant]." *Preslar v. Sec'y of Health and Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

### D.    The ALJ's Findings

Following the five step process, the ALJ found that Pardee was not disabled because, despite her limitations, there were a significant number of jobs available that she could perform.

(Tr. 12-24).  The ALJ made his determination from December 20, 2004, when the previous ALJ had rendered his decision in Pardee's other case, which became final and binding when she did not seek judicial review.  (Tr. 12).

At Step I, the ALJ found that Pardee had not engaged in substantial gainful activity since December 20, 2004, since she had not worked except for the brief attempt in 2008.  (Tr. 15).  At Step Two, the ALJ determined that Pardee had the following severe impairments:  "right shoulder tendonitis/tendonopathy/impingement and status post left elbow fracture with ulnar nerve neuropathy."  (*Id.*).  At Step Three, the ALJ concluded that Pardee's combination of impairments did not meet or medically equal on of the listed impairments in the CFR.  (*Id.*).  The ALJ then determined Pardee's RFC.  (Tr. 16-18).  He first found that her impairments could reasonably be expected to produce the alleged symptoms.  (Tr. 16-17).  However, the ALJ, recounting Pardee's testimony in detail, found incredible her characterization about the intensity, persistence and limiting effects of her symptoms, as it did not comport with the medical evidence in the record.  (Tr. 16-18).  The ALJ determined that although Pardee testified that she was currently on Vicodin for pain and Celebrex for arthritis, both prescribed by Dr. Coffey, the records indicate that Vicodin had not been prescribed by Dr. Coffey since November 2006 and there is no record of Dr. Coffey ever prescribing Celebrex, or even diagnosing arthritis.  (Tr. 17).  The ALJ then found that although Pardee continued to complain of right arm pain and limitations, no treatments had been conducted on her right arm since 2006.  (*Id.*).  The ALJ found incredible Pardee's complaints of extremely high pain, as her most recent medical records only indicated some pain running in her fourth and fifth fingers, but that otherwise she was not painful.  (*Id.*).  Finally, though Pardee had applied for benefits listing an onset date of November 2002, her treatment records showed that her right arm pain was only treated as being exacerbated

as of February 2005, and that records prior to that, in October 2002, showed that she was doing quite well at that time.  (*Id.*).

The ALJ then went through all of the medical evidence and determined that Pardee's RFC was as follows:  she could lift and carry ten pounds occasionally and three pounds frequently, she could not engage in extreme postures involving reaching more than occasionally, and could not "engage in work demanding frequent manipulation involving fine work, gripping, grasping, twisting, turning, picking, pushing, or pulling with hands or fingers."  (Tr. 18-22).  At Step Four, the ALJ determined that, based on this RFC assessment, Pardee was not able to perform past relevant work.  (Tr. 22).  At Step Five the ALJ determined that Pardee, however, retained an RFC that permitted her to perform a significant number of jobs in the national economy, based on the testimony of the VE.  (*Id.*).

### E.   Standard of Review

The District Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g).  Judicial review under this statute is limited in that the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record."  *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal citations omitted); *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 654 (6th Cir. 2009) ("[I]f an agency has failed to adhere to its own procedures, we will not remand for further administrative proceedings unless the claimant has been prejudiced on the merits or deprived of substantial rights because of the agency's procedural lapses.") (internal quotations omitted).  Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to

support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotations omitted). In deciding whether substantial evidence supports the ALJ's decision, the Court does "not try the case *de novo*, resolve conflicts in evidence or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Rogers*, 486 F.3d at 247 ("It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant.").

When reviewing the Commissioner's factual findings for substantial evidence, the Court is limited to an examination of the record and must consider the record as a whole. *Bass*, 499 F.3d at 512-13; *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). The court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council," or in this case, the ALJ. *Heston*, 245 F.3d at 535; *Walker v. Secretary of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989). There is no requirement, however, that either the ALJ or this Court discuss every piece of evidence in the administrative record. *Kornecky v. Comm'r of Soc. Sec.*, 167 Fed. Appx. 496, 508 (6th Cir. 2006) ("[A]n ALJ can consider all evidence without directly addressing in his written decision every piece of evidence submitted by a party.") (internal quotations omitted). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted).

### F.      Analysis

In her motion for summary judgment, Pardee's only complaint with the ALJ's findings is that he ignored Dr. Coffey's March 19, 2008 treatment notes in which Dr. Coffey dictated that

16

"we are going to set [Pardee] up with RS Medical for a TENS unit desensitization protocol due to the fact that this is going to be a prolonged course and she had a chronic ulnar nerve entrapment.  It is going to take a lot of time to get better."  (Pl. Mot. Summ. J. at 9; Tr. 306). Pardee argues that this evidence demonstrates her continued pain in her left arm and that the ALJ's failure to consider such treating physician evidence led him to pose questions to the VE that did not fully take into account Pardee's limitations.  (Pl. Mot. Summ. J. at 7-9).  As such, Pardee argues that the jobs the VE testified were available to her were not jobs that fully accounted for her limitations, and concludes that substantial evidence did not support the ALJ's conclusion that Pardee was not disabled.  (*Id.* at 6-7, 10).  The court disagrees.

Pursuant to the "treating source" regulation adopted by the Social Security Administration, the ALJ must give controlling weight to a treating physician's medical opinion if he or she finds the opinion "'well-supported by medically acceptable clinical and laboratory diagnostic techniques' and 'not inconsistent with the other substantial evidence in the record.'" *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) (quoting 20 C.F.R. § 404.1527(d)(2)); *see also Schaal v. Apfel*, 134 F.3d 496, 503(2d Cir. 1998).  Here, contrary to Pardee's argument, the ALJ gave full weight to treating Dr. Coffey's medical opinions.  The ALJ painstakingly detailed Pardee's treatment record, including a page and a half discussing her treatment by Dr. Coffey.  (Tr. 19-21).  The ALJ specifically addressed the March 19, 2008 treatment notes, which, in addition to the language Pardee quotes, also stated that, while Pardee reported continued pain in her fingers, the examination was normal and she was otherwise "not painful."  (Tr. 20; 117).  The ALJ found that in all of Dr. Coffey's records, there was no indication of significant pain, let alone "extremely high pain," and that Dr. Coffey had not prescribed any pain medication for Pardee since November 2006.  (Tr. 20).  The ALJ considered

Dr. Coffey's notes that, in November 2007, Pardee's left hand grip strength was equal to that of her right. (*Id.*). The ALJ further noted, and specifically gave great weight to, Dr. Coffey's "to whom it may concern" letter, where the doctor opined that it may be difficult for Pardee to perform repetitive factory work or other repetitive activity and lifting. (Tr. 21; 302). The ALJ considered all of this evidence in his RFC assessment, and determined that because of her upper extremity limitations Pardee would be limited to the "generous" RFC assessment outlined in Section II(D) of this Recommendation, even though the ALJ found that the medical evidence suggested Pardee possibly had a much greater capacity at the time of his decision. (Tr. 22). There is nothing in the record to suggest that the ALJ did not give controlling weight to Dr. Coffey's opinions or did not fully consider them in his determination of Pardee's RFC.

Second, the RFC assessment the ALJ made is supported by substantial evidence in the record. Pardee tendered no treating physician notes for the pain in her right arm after May 2006, and the consultative report of Dr. Ray in October 2006 found that, with regard to Pardee's right arm, she was able to make a full fist, had full range of motion in her shoulder, elbow and wrist, and had grip strength of 45 pounds. (Tr. 261-262; 264). With regards to her left arm, Dr. Coffey's records never once indicated the extremely high pain to which Pardee testified, and never advised any functional limitations other than the ones outlined in the "to whom it may concern" letter regarding repetitive factory work. (Tr. 302). Dr. Coffey's last treatment notes indicate that Pardee had not yet attended physical therapy for her left arm after the ulnar nerve transposition surgery, but records from prior courses of physical therapy show it had been very helpful to Pardee's condition. (Tr. 328; 203; 207-210; 216-233). Furthermore, Dr. Coffey's notes from March 2008 did indicate that it would take a long time for Pardee's ulnar neuropathy to fully heal, but found the surgery successful and did not place any limitations or restrictions on

Pardee during her recovery. (*Id.*). Finally, Pardee's reports of being prescribed high powered pain medication, such as Vicodin, were not substantiated by the recent medical record. (Tr. 20). For these reasons, the court finds that substantial evidence in the record supports the RFC assessment made by the ALJ.

Because substantial evidence exists to support the ALJ's RFC assessment, the only remaining question is whether the questions he posed to the VE during her testimony fully accounted for the limitations of the RFC assessment. The court finds that they did.

A finding that Pardee is not disabled must include "substantial evidence" to support the conclusion that Pardee "has the vocational qualifications to perform specific jobs." *Varley v. Sec'y of Health & Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987). This evidence "may be produced through reliance on the testimony of a vocational expert (VE) in response to a hypothetical question, but only if the question accurately portrays [Pardee's] individual physical and mental impairments." *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 238 (6th Cir. 2002). Here, the ALJ's hypothetical scenario took into account the following limitations:

> I'd like you to consider that this is a person who cannot reach extreme postures that would – which postures would themselves involve reaching with the arms, while stopping, kneeling, bending more often than occasionally . . . This person cannot successfully engage in work demanding frequent manipulation involving fine work, gripping, grasping, twisting, turning, picking, pushing, or pulling with the hands or fingers. This person cannot lift and carry more than ten pounds occasionally and three pounds frequently . . . would there be any other work that would accommodate?

(Tr. 45-46). This hypothetical scenario adequately took into account the limitations the ALJ determined Pardee had, which were part of the RFC assessment he made. Further, the ALJ's questions generated testimony from the VE that jobs existed in significant numbers for which Pardee, given her limitations, education, experience and age, would be qualified. (Tr. 46-47); *see also Kyle v. Comm'r of Soc. Sec.*, 609 F.3d 847, 855 (6th Cir. 2010) (burden is on

Commissioner to show significant number of jobs in economy that would accommodate claimant's FRC and vocational profile). Therefore, the court finds that substantial evidence supports the ALJ's conclusion that Pardee is not disabled under the SSA.

## III. CONCLUSION

For the foregoing reasons, the court **RECOMMENDS** that Plaintiff Melanie Pardee's Motion for Summary Judgment (Doc. #9) be **DENIED** and Defendant Commissioner's Motion for Summary Judgment (Doc. #10) be **GRANTED**.

Dated: January 19, 2012               s/David R. Grand
       Ann Arbor, Michigan           DAVID R. GRAND
                                United States Magistrate Judge

### NOTICE TO THE PARTIES REGARDING OBJECTIONS

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and Fed.R.Civ.P. 72(b)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of HHS*, 932 F.2d 505, 508 (6th Cir.1991); *United States v. Walters*, 638 F.2d 947, 949–50 (6th Cir.1981). The filing of objections which raise some issues, but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Secretary of HHS*, 931 F.2d 390, 401 (6th Cir.1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir.1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

A party may respond to another party's objections within 14 days after being served with

a copy.  *See* Fed. R. Civ. P. 72(b)(2); 28 U.S.C. §636(b)(1).  Any such response should be

concise, and should address specifically, and in the same order raised, each issue presented in the

objections.

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that the foregoing document was served upon counsel of record
and any unrepresented parties via the Court's ECF System to their respective email or First Class
U.S. mail addresses disclosed on the Notice of Electronic Filing on January 19, 2012.

<u>s/Felicia M. Moses</u>
FELICIA M. MOSES
Case Manager